# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 719 | **DATE** | December 19, 2003 |
| **CASE TITLE** | *United States of America v. Samuel L. Brown* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, the Court GRANTS Defendant Brown's Motion to Suppress [17-1]. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | DEC 22 2003 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 35 |
| | Copy to judge/magistrate judge. | | | |
| RTS | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |


DOCKETED
DEC 2 2 2003

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Hon. Blanche M. Manning |
| v. ) | |
| ) | 03 CR 719 |
| SAMUEL L. BROWN ) | |

## MEMORANDUM AND ORDER

The Government charged Defendant Samuel L. Brown with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), and possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k). The present matter comes before the Court on Brown's motion to suppress his arrest and all evidence obtained as a result of the arrest. For the reasons set forth below, this Court GRANTS this motion.

## BACKGROUND[1]

This case stems from Brown's arrest by the Chicago Police Department on the night of March 5, 2003, in a parking lot adjacent to a liquor store on the 5400 block of South Halsted Street in Chicago, Illinois. As in most motions to suppress, Brown and the police have widely divergent versions of what transpired on the night in question. What is not in dispute, however, is the fact that the arrest took place in an area of "high criminal activity," including high arrest rates for "narcotics activities" and violent crime (including violence against police officers). With these facts in mind, the Court will examine each parties' version of the events leading up to Brown's arrest.

---

[1] The Background facts are taken from the suppression hearing and the parties' submissions.

A.  **The Government's Version of Brown's Arrest[2]**

On the evening of March 5, 2003, Chicago Police Officers Gorman, Shannon, Rios, and Rodriguez (collectively, "the Officers") were on patrol in the area where Brown was arrested. At that time, the Officers were all members of the "Special Operations Unit," which operates in areas were there are high incidents of narcotics trafficking and violent crime.

The Officers were driving in two squad cars, with Gorman and Shannon in the lead car and Rios and Rodriguez driving directly behind them. At around 8:00 p.m., the Officers were driving south on the 5400 block of South Halsted Street, when they noticed two cars parked in a parking lot right adjacent to a food and liquor store. The two cars were parked one in front of the other facing Halsted Street, with four persons in each vehicle. As they passed these vehicles, the Officers observed the driver and front passenger (who later turned out to be Defendant Brown) of the car nearest Halsted Street drinking from what appeared to be a bottle of alcohol.

Based on seeing the open alcohol in the first vehicle and the fact that it was suspicious for two cars and eight people to be sitting in a parking lot in this area, Officers Rios and Rodriguez, who were in the tail car, pulled into the driveway leading to parking lot to investigate. Immediately thereafter, the lead car, containing Officers Gorman and Shannon, made a u-turn and also pulled into the driveway. The Officers testified that when pulling into the parking lot, they intended to arrest the driver and the passenger "for drinking" in a motor vehicle in violation of a City of Chicago ordinance.

---

[2]  The Government's version is based on the testimony of the four police officers involved in the arrest.

Upon exiting their patrol car, Officers Rios and Rodriguez proceeded to the second car because the four occupants were exiting the vehicle at that time. Although the officers did not testify that the occupants were acting in a threatening manner, Rios and Rodriguez testified that they were concerned for their safety when they saw the occupants exiting the second car. While Officers Rios and Rodriguez were walking past the first car, Brown attempted to open the passenger's side door. In response, Officer Rios "held onto the door and told him to stay there and don't move." He then proceeded to the second car.

Immediately thereafter, Officers Gorman and Shannon exited their patrol car. Officer Shannon proceeded to the second car to assist Officers Rios and Rodriguez with the four occupants of the second car. Meanwhile, Officer Gorman went to the front car. According to Officer Gorman, because he had seen Brown and the driver drinking alcohol, he was going to "plac[e] them into custody."

Upon arriving at the front passenger's side door of the first car, Officer Gorman ordered everyone in the car "to place their hands up." Officer Gorman testified that all the occupants complied, except for Brown. Brown, on the other hand, "kept fumbling with his hands, and [] seemed very agitated." Then, according to Officer Gorman, Brown "reached between the seat and the middle console and removed what appeared to be a handgun. Officer Gorman then pulled out his service revolver and "yelled" for Brown to drop the gun. After being ordered to drop the gun several times, Brown finally complied.

Upon hearing Officer Gorman yelling for Brown to drop the gun, Officer Rios proceeded back to the first car and removed Brown from the car and placed him into custody. After Brown

was removed from the car, Gorman recovered "a .40 caliber, Highpoint semiautomatic pistol" from the floor of the car where Brown had dropped it and a bottle of gin.

**B.     Brown's Version of the Events Leading to his Arrest[3]**

Not surprisingly, Brown offers a completely different story than the Officers. According to Brown, neither he nor anyone else in the car had a gun or was drinking alcohol. Brown asserts that on the day in question, he and the other occupants of the two cars attended a funeral and a repast. After the repast, which was located at 50th and Racine, Brown and the others went in two cars to the liquor store on 54th and Halsted. When they arrived at the liquor store, the two cars parked one in front of the other facing Halsted Street in the paved parking lot directly adjacent to the liquor store. Everyone in the two cars, except for Brown, then went into the liquor store and purchased beer and a bottle of gin. Brown apparently did not go into the liquor store because he was asleep in the front passenger's seat of the first car facing Halsted Street.

Immediately after making their purchase at the liquor store, the men got back into the cars, where Brown was still sleeping. None of the occupants opened any of the alcoholic beverages which they had just purchased. Both cars then started to leave the parking lot. Suddenly, before they could pull out of the parking lot, "uniform police appeared and started knocking on the front passenger's window" of Gosa's car. Brown, however, being fast asleep, did not wake up. Only after the police got all of the other occupants out of the car were they able to wake Brown up. The two uniformed officers then handcuffed Brown and placed him into the squad car.

---

[3]     Brown bases his version on the testimony of the driver of the car, Marlon Gosa, and one of the passengers in the back seat, Brian Sloan.

-4-

The uniformed police officers then searched the car. This search, however, did not result in the finding of any contraband. Subsequently, two other police officers, in plain clothes, arrived and made a second search of the vehicle. This time, the police found a gun in the car and charged Brown with possession of it. According to Gosa, the police were "very unhappy with [Brown] because he had been difficult to get out of the car because he had been sleeping and because he complained about why we had been stopped and searched." Therefore, the police charged Brown with possession of the gun.

After being charged with possession of a firearm as a convicted felon, Brown brought the instant motion to suppress.

## ANALYSIS

The Fourth Amendment protects the right of the people to be secure in their persons and property against unreasonable searches and seizures. U.S. Const. Amend. IV. With respect to "seizures" of persons, the Fourth Amendment protects not only traditional arrests but also brief detentions. Terry v. Ohio, 392 U.S. 1, 16 (1968). The Supreme Court, however, has held that "not all personal intercourse between policemen and citizens involves seizures of persons." Id. 19 n. 16. With regard to the Fourth Amendment, there are three distinct categories of police-citizen encounters: (1) arrests, which must be supported by probable cause; (2) investigatory stops (Terry stops) – brief, nonintrusive periods of detention – which must be supported by a reasonable suspicion that a person has committed or is committing a crime; and (3) voluntary encounters, characterized by cooperation and non-coercive government questioning. United States v. Nobles, 69 F.3d 172, 179-80 (7th Cir. 1995).

Here, the Government contends that the initial encounter between the Officers and Brown and his companions did not implicate the Fourth Amendment because it was simply non-coercive questioning within "the Officers' community caretaking function." "A person is seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Michigan v. Chesternut, 486 U.S. 567, 573 (1988). Examples of factors that may induce a person to believe that he was not free to leave are the threatening presence of several officers, display of their weapons, physical touching of the person, use of forceful language or tone of voice, and the remoteness of the place of detainment. United States v. Mendenhall, 446 U.S. 544, 554 (1980).

In United States v. Packer, 15 F.3d 654, 655-657 (7th Cir. 1994), the defendant, who was charged as a felon in possession of a firearm, was in a parked car with three other occupants. After driving past the car, the police activated their lights and pulled in front of the car to prevent the occupants from driving away. As one of the officers approached the car to question the individuals, "she asked the occupants to put their hands in the air where she could see them." Id. at 657. While noting that the "intrusion was minimal," the Seventh Circuit, nevertheless held that "an investigatory Terry Stop had occurred" because "a reasonable person in [d]efendant's position would not feel free to leave." Id.

Here, the Government's contention that this was simple non-coercive questioning is contradicted by the Officers' testimony. Officers Gorman and Shannon testified that because they had seen Brown and the driver of the first car drinking, they were going to arrest them "for

drinking."[4] When the Officers pulled into the driveway of the parking lot, they did so in a way such as to prevent any cars from exiting. Officers Rios testified that while he was walking past the first car, Brown attempted to open the passenger's side door. In response, Officer Rios "held onto the door and told him to stay there and don't move." Officer Gorman testified that when he reached the first car he ordered "everyone to put their hands up." Based on these facts, this Court finds that, similar to Packer, "a reasonable person in [Brown's] position would not feel that he was free to leave," and therefore, the initial encounter was at a minimum a Terry stop.

Accordingly, because the initial encounter between the Officers and Brown was a seizure within the Fourth Amendment, the Court must examine whether the Officers had sufficient grounds to make the stop. Before discussing this, however, the Court will discuss the standards governing police arrests and stops.

To arrest a criminal suspect without an arrest warrant, the police must have probable cause, "under the totality of the circumstances, to reasonably believe that" the suspect committed or is in the process of committing a criminal offense. United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir. 1995). In determining whether the police had probable cause, the court must make "a practical, commonsense decision whether, given all of the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in [a] particular place." Id. This determination requires more than "mere suspicion," but does not "reach the level of virtual certainty." Id.

---

[4] Officer Gorman testified that as he approached the car, he "knew [he] was going to be placing them into custody for drinking." Likewise, Officer Shannon testified that his intention was to "effectuate an arrest" because he "saw them drinking."

-7-

A police officer, who lacks probable cause for an arrest, may stop a suspect to briefly investigate the circumstances provoking the officer's suspicion that the suspect was or is about to engage in criminal activity (a Terry Stop). Terry v. Ohio, 392 U.S. 1 (1968). To make a Terry Stop, the officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion that the person is or was committing a crime. Id. at 21; United States v. Vega, 72 F.3d 507, 515 (7th Cir. 1995). To determine if the officer had a "reasonable suspicion" of criminal activity, the court must examine the "totality of the circumstances as they appeared to the officer at the time of the stop." United States v. Ocampo, 890 F.2d 1363, 1368 (7th Cir. 1989).

Similarly, under the "automobile exception" to the Fourth Amendment's warrant requirement, the police may search an automobile without a warrant if the search is supported by probable cause to believe that the car contains contraband. United States v. Wimbush, 337 F.3d 947, 950-51 (7th Cir. 2003); United States v. Ledford, 218 F.3d 684, 688 (7th Cir. 2000). To determine if the police had probable cause, the court should examine the totality of the circumstances to assess if there was a "fair probability" that contraband was present in the car. Id. The search may extend to any part of the car in which "contraband may be concealed." Id.

Here, as explained above, Brown and the Government present two completely different versions of the facts surrounding Brown's arrest. After closely examining the testimony and demeanor of the witnesses, this Court finds that the versions told by Brown's witnesses were more credible and consistent. Of particular importance to this Court was the testimony of Officer Gorman describing the bottle which Brown and the driver were allegedly drinking from. Officer Gorman described the liquor bottle as a "clear bottle with a golden cap." The problem that this

Court has with this testimony is how, in driving by the parking lot in a matter of seconds, could Officer Gorman see the "golden cap" on the bottle, particularly if Brown and the driver were drinking from the bottle. If they were drinking from the bottle, then the cap could not have been on the bottle, which means that if Gorman saw the "golden cap," a reasonable inference would be that they were not drinking.

In contrast to the Officers, the Court finds the testimony by Gosa and Sloan (Brown's witnesses) to be credible. Although these witnesses are friends of Brown and have criminal records, after observing their demeanor and considering the reasonableness of their testimony, this Court finds their testimony credible. In particular, the Court notes that Gosa testified that the gun found in the car belonged not to Brown but to his brother and that none of the occupants in the car realized there was a gun in the car. If Gosa were lying, this Court finds it improbable that he would implicate his own brother in a felony. Likewise, the testimony that Brown was sleeping is consistent with the testimony that Brown had been drinking at the repast.

This Court thus finds that neither Brown nor anyone else in the car was drinking alcohol in the parking lot on the night in question. Accordingly, the Court finds that without the alleged open alcohol in the motor vehicle, the police did not have a reasonable suspicion that a crime was being committed or going to be committed.[5]

---

[5] The Government also contends that the Officers had reasonable suspicion because of the fact that they observed two cars parked in a high crime area at night. In Packer, 15 F.3d at 658, in reversing the district court's denial of a motion to suppress, the Seventh Circuit held that the fact four men were sitting in a parked car at 1:00 a.m. in a high crime area was not sufficient grounds to justify a Terry Stop. Accordingly, this Court finds that the mere fact that there were two cars parked in a parking lot at 8:00 p.m. adjacent to a food and liquor store, which was open for business at that time, was not sufficient for the Officers to make a Terry Stop. Moreover, although the Officers testified that the parking lot was in a high crime area, the Officers did not testify that the parking lot itself was a problem location. In fact Officer Gorman testified that he

Additionally, even if this Court were to find that Brown and the driver were drinking in the car, because the vehicle was in a private parking lot, it was not against the law for them to be doing so. Thus, the police lacked probable cause to arrest Brown and did not have reasonable suspicion to justify an investigative stop.

The Government contends that three laws were possibly violated by the drinking in the car: "(1) transportation of alcohol in a motor vehicle (625 ILCS 5/11-502); (2) driving while under the influence of alcohol (625 ILCS 5/11-500); and (3) drinking on a public way (Chicago Municipal Code, Ch. 8-4-030)." Contrary to the Officers' belief on the night in question, drinking alcohol in a motor vehicle is not always a violation of the law. Chapter 8-4-03 of the Chicago Municipal Code states that:

> (a) It shall be unlawful for any person to drink any alcoholic liquor as defined by law <u>on any pubic way</u> in this city . . . .
>
> (b) It shall be unlawful for any person to transport, carry, possess or have any alcoholic liquor in or upon any motor vehicle <u>upon the public way</u> in the city except in the original package and with the seal unbroken.

(Emphasis Added.) The Code defines a "public way" as "any sidewalk, street, alley, highway, or other public thoroughfare." Ch. 1-4-090. Similarly, under the Illinois Vehicle Code, neither driver nor passengers in a motor vehicle "may transport, carry, possess or have any alcoholic liquor within the passenger area of any motor vehicle <u>upon a highway</u> . . . except in the original container and with the seal unbroken." 625 ILCS 5/11-502 (emphasis added). Accordingly, based on the Chicago Municipal Code and the Illinois Vehicle Code, it is only illegal to drink or

---

did not know "if there were narcotic sales coming out of the store."

possess open alcohol in a motor vehicle if the vehicle is "upon a public way" or "a highway." See People v. Kolody, 558 N.E.2d 589, 594 (Ill. App. Ct. 1990).

In Kolody, 558 N.E.2d at 591, the defendant was arrested for unlawful possession of marijuana after a police officer searched his car after observing the defendant drinking alcohol in a private parking lot adjacent to a bowling alley. Affirming the suppression of the drugs, the Illinois Appellate Court found that there was no probable cause to search the car because drinking liquor in or near a car parked in a private parking lot attached to a bowling alley did not violate the law. Id. at 594.

Here, similar to Kolody, the Officers testified that while on routine patrol, they observed two cars parked in a parking lot next to a liquor store in a high crime/narcotics area and saw Brown and the driver drinking a bottle of what appeared to be alcohol in one of the vehicles. Based on this, Officers Gorman and Shannon testified that they were going to arrest them "for drinking" in a motor vehicle. As explained above, the Officers then pulled into the parking lot to conduct an investigatory stop and to arrest Brown and the driver. After carefully reviewing the testimony and closely examining the photographs of the parking lot, which were received as exhibits at the hearing, this Court finds that the car Brown was in was parked in a private paved parking lot adjacent to a liquor store, which was open for business at that time, not on a public way or a highway. Thus, Brown and the driver of the car were not in violation of the law by allegedly drinking in the car at that location.[6] Therefore, as in Kolody, even though there was

---

[6] This conclusion is supported by the fact that the driver's citation for drinking in a motor vehicle was apparently not pursued by the local district attorney.

open alcohol in the car, this Court finds that based "on the totality of the circumstances," the police did not have a reasonable suspicion to conduct a Terry Stop.

The Government also contends that the Officers had reasonable suspicion that the driver of the car was intoxicated and therefore in violation of 625 ILCS 5/11-501 ("DUI"), which makes it illegal for any person to "be in actual physical control of any vehicle within this State while . . . under the influence of alcohol." This contention, however, is not supported by the evidence. None of the Officers testified that they were going to arrest or even investigate the driver for a DUI, only that they thought the driver was in violation of the law because he was drinking while in a motor vehicle. Moreover, the Government did not present any evidence which showed that the driver was "under the influence of alcohol," such as stumbling or slurred speech. Indeed, the Officers did not even give the driver a field sobriety test, yet alone a ticket for DUI. Consequently, this Court finds that the Officers did not have reasonable suspicion to stop the driver for DUI.

Accordingly, "based on the totality of the circumstances," this Court finds that even if Brown and the driver were drinking alcohol, the Officers did not have a reasonable suspicion to conduct a Terry stop. In making this decision, this Court "acknowledge[s] the reality of the mean streets that police officers face every day in their struggle with the criminal element of our society." Packer, 15 F.3d at 659. Nevertheless, this Court must balance this reality, with our Constitutional safeguards, and therefore, must exclude the evidence obtained from the Officers' improper stop.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant Brown's Motion to Suppress [17-1]. It is so ordered.

ENTER:

*Blanche M. Manning*
BLANCHE M. MANNING
U.S. DISTRICT COURT JUDGE

DATE: 12-17-03